**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Suban Noor,<br><br>Plaintiff,<br>v.<br>United States of America,<br><br>Defendant. | Civil Action No.<br><br><br>**COMPLAINT** |

Suban Noor, by her attorney, brings this complaint against the United States pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §1346(b).

## INTRODUCTION

1. During Operation Metro Surge, United States federal immigration officers subjected Suban Noor to treatment so harsh and deliberately cruel that it could be fairly described as tortious. This action seeks damages for that unlawful treatment.

2. Ms. Noor entered the United States as a refugee late in 2023. Born in Somalia, she and her family had lived in the Hagadera Dadaab Refugee Camp in Kenya since around 2011. While she awaited entry to the United States, the United States Federal Government would have run numerous background checks on her and her family. They would have determined that she was not a terrorist or a threat to the United States before letting her in the county.[1]

[1] As explained by Judge John R. Tunheim, "To be admitted into the United States as a refugee, a prospective refugee must complete many steps. First, the prospective refugee must be referred to the United States Refugee Admissions Program (USRAP), an interagency initiative involving multiple governmental and nongovernmental entities, including the Department of State, the Department of Homeland Security, the United Nations High Commissioner for Refugees, the Department of Health and Human Services'

3. Ms. Noor and her family originally settled in Tucson, AZ in late 2023 but moved to Willmar, MN about six months later. In Willmar, she attends high school, learned English, and has obtained a job at Walmart.

4. After a year in her new country, Ms. Noor began the process to adjust her immigration status.

5. Notwithstanding her lawful entry to our country, her assimilation into Minnesota, and her timely attempt to change her status to a lawful permanent resident, on January 12, 2026, federal agents, as part of Operation Metro Surge, observed Ms.

---

Office of Refugee Resettlement, Resettlement Support Centers, and the International Organization for Migration. To obtain such a referral, the prospective refugee must typically register with the United Nations High Commissioner for Refugees (UNHCR) in the country where they have sought refuge. UNHCR then determines whether resettlement in a third country is the best option. But because so many people are displaced worldwide, typically only about one percent of registrants are referred for resettlement in a third country. After a refugee applicant is referred, they must undergo extensive security screening conducted by multiple federal agencies, including the National Counterterrorism Center, the FBI's Terrorist Screening Center, the Drug Enforcement Agency, the Department of Defense, and others. An applicant's biometric and biographic information is screened against numerous databases, including the Consular Lookout and Support System and other intelligence community systems. After completing the biometric and biographic checks, USCIS conducts an interview to determine whether the individual qualifies for refugee status. During this interview, USCIS verifies the applicant's biographic information, confirms that the applicant properly accessed the USRAP, and assesses whether the applicant meets the legal definition of a refugee. USCIS also evaluates whether the applicant is admissible to the United States, whether the applicant has participated in the persecution of others, and whether the applicant has already been firmly resettled in another country. Once an applicant is conditionally approved, applicants must complete a medical examination as well as a cultural orientation program. Applicants are assigned to a local resettlement agency in the United States. Before traveling to the United States, applicants are subject to additional security screening. Upon arrival, applicants are inspected by U.S. Customs and Border Protection, and if eligible, admitted into the United States."

*U.H.A. v. Bondi*, 822 F.Supp.3d 1077, 1022-1025 (D. Minn 2026) (footnotes omitted).

Noor and saw only that her skin was dark, that she wore a hajib, and that she appeared Somali. For them, that was enough to violate her rights.

6. The agents violently arrested Ms. Noor, held her for five days without legal authority in the Whipple Building without a bed, housed her overnight with adult men, refused to meet her religious dietary needs, refused to give feminine hygienic products, refused to give her clean clothes, refused to let her shower, attempted to make her sign removal papers, refused to let her talk with her family or a lawyer for days, and eventually abandoned her alone at night in St. Paul.

7. The Government's intent to harm Somali immigrants in Minesota is well documented. With no basis in law, the Government treated Ms. Noor, and other Somalis in Minnesota, horribly simply because they wanted to. The Government's only agenda was to hurt people, like Ms. Noor, who were Somali and therefore "garbage."

8. Further, the Government had no legal authority to treat Ms. Noor as they did. They disregarded their own policies regarding the treatment of refugees as well as the requirements for warrantless arrests, housing of detained individuals, and respect of religion, among others.

## PARTIES

9. Plaintiff Suban Noor is a twenty-year-old refugee and currently lives in Willmar, MN. As a Somali refugee, she was designated a birthdate of 01/01/2006 upon entry to the United States but her actual birthdate was likely in the summer of 2006, making her 19 biological years old at the time of the assault, battery, and false arrest by federal agents.

10. United States of America is the proper defendant to answer for the acts of "federal agencies" and their employees, officers, and agents. Such agencies include, without limitation, the U.S. Department of Homeland Security ("DHS"), its component agencies, such as the U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP").

11. At all relevant times, upon information and belief, the agents were deployed for Operation Metro Surge, were using federal vehicles and equipment, were wearing federally supplied tactical gear, and used federal facilities, including the Whipple Federal Building.

12. At all relevant times, federal officers referenced in this Complaint were employees of the United States, working within the scope and course of their employment by these federal agencies.

13. At all relevant times, the federal officers referenced in this Complaint were "investigative or law enforcement officers" within the definition of 28 U.S.C. § 2680(h).

## Jurisdiction and Venue

14. This Court has jurisdiction over Mr. Noor's claims under the Federal Tort Claims Act pursuant to 28 U.S.C. § 1346(b).

15. Ms. Noor has exhausted all available administrative remedies pursuant to 28 U.S.C. § 2675.

16. Ms. Noor filed an administrative complaint with the with the United States Department of Homeland Security, US Customs and Border Protection, and US Immigration and Customs Enforcement on or about April 20, 2026, under the Federal

Tort Claims Act, 28 U.S.C. §§ 2671 et seq., seeking redress for the violations of her rights and damages proximately resulting from them. The complaints included video of the encounter.

17. The administrative complaints were sent both by electronic mail as well as US postal service certified mail.

a. CBP acknowledged receipt of the administrative claim on April 23, 2026.

b. DHS did not acknowledge receipt of the administrative claim but USPS tracking shows that they received the complaint on April 29, 2026.

c. ICE did not acknowledge receipt of the administrative claim but USPS tracking shows that they received the complaint on April 29, 2026.

- On or about July 1, 2026, ICE counsel Cecelia A. Tripi sent an email requesting additional information about Ms. Noor. Ms. Noor's attorney provided the information on July 2, 2026. On July 8, 2026, Ms. Noor's attorney and Ms. Tripi had a call to further discuss the complaint and did so again in early August 2026. On August 26, 2026, Ms. Noor's attorney sent an additional letter to Ms. Tripi to discuss comparables for Ms. Noor's injuries. On November 3, 2026, Ms. Noor's attorney emailed Ms. Tripi to ask if ICE was going to extend an offer. She replied that they were not going to send an offer and, as the six-month window had expired, she did "not think we can send a denial letter."

18. Six months have now elapsed since Ms. Noor's claims were received with no decision from ICE or any other agency. The claims are therefore deemed finally denied. 28 U.S.C. § 2675(a).

19. Pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1402(b), venue is proper in this District because Plaintiff resides in Minnesota, and Defendant is the United States and officers or employees of the United States or any agency thereof acting in their official capacity or under color of legal authority, or an agency of the United States.

## Facts

### A. Government's unlawful assault, battery, arrest, detention, and harm of Suban Noor.

20. Suban Noor attends high school in Willmar, MN. She also works at Walmart.

21. She had lived in a refugee camp in Kenya most of her life. She is Muslim and wears traditional Somali clothing, including a hajib. She is devout and prays daily.

22. On January 12, 2026, Suban Noor was driving her mother to work. While she was driving, she noticed what she believed were immigration agents following her because in a car behind her she could see several people wearing masks.

23. Ms. Noor's car registered lawfully in her name.

24. Afraid that they would target her, Ms. Noor drove to a busy place in Willmar and parked. She hoped that she could find proof of her immigration status to give to the agents.

25. After she parked, two agents immediately came to her car. One, hereinafter "Agent #1", wore a camouflaged face mask and a San Francisco Giants baseball hat, as reflected below:




26. The other agent, hereinafter "Agent #2", wore a 13-fifty apparel hat or hoodie, as reflected below:



27. Upon information and belief, the agents had no warrant for Ms. Noor and had no reason to believe she was in violation of any law, concerning immigration or anything else.

28. Agent #2 agent asked Ms. Noor if she had documentation.

29. Ms. Noor told Agent #2 that she had her I-94 card in her purse. Agent #1 heard this conversation.

30. While Agent #2 was talking with Ms. Noor, Agent #1 reached in and took her car keys out of the ignition and told her to get out of the car. As he did, he asked Ms. Noor, "where are you from?"

31. Ms. Noor replied that she was from Africa, but Agent #1 said, "no, you're from Somalia."

32. Ms. Noor tried to explain that she was had lived in a Kenyan refugee camp, but Agent #1 interrupted her and told her to get out of the car.

33. She asked why she had to get out of the car and said again that she had her I-94.

34. Agent #1 told her that was not good enough.

35. Agent #1 leaned into the open window.

36. Agent #1 then slapped her.

37. Ms. Noor has braces, as many children do, and the inside of her cheek was cut open from the slap. She cried out in pain.

38. Agent #1's conduct violated the Fourth Amendment and the use of force

policies of his own department. See, U.S. Dep't of Homeland Sec., Policy Statement 044-05 (Revision 01), Update to the Department Policy on the Use of Force (Feb. 6, 2023).[2]

39. Throughout her encounter with agents of Defendant, Defendant repeatedly violated those departmental policies.

40. The slap was not a light slap, it was very hard. She started to cry. It likely also gave her a concussion as medical reports from after the incident discuss the post-concussion symptoms that Ms. Noor had.

41. Agent #1 opened the car door and started to pull her out of the car. Agent #2 assisted in pulling her out.

42. Ms. Noor told both of them that she had legal paperwork but Agent #1 said that they didn't care and continued to pull her out. Confusingly, Agent 2 told her that they merely needed to confirm her identity.

43. Ms. Noor repeatedly told them that she had an I-94 and was legally in the United States.

44. As the agents pulled her from her car, her cellphone fell from her hands and landed on the floor of the passenger side of her car. Her purse remained in the car.

45. Agent #1 pushed her up against the car and put handcuffs on her.

46. The agents then grabbed Ms. Noor and pulled her toward another car.

---

[2] https://www.dhs.gov/sites/default/files/2023-02/23_0206_s1_use-of-force-policy-update.pdf.



47. Ms. Noor's shoes fell off.



48. Neither agent identified themselves or identified the federal agency they worked for, or the legal reasoning for tearing her out of the car. To many, it looked like a violent kidnapping on the calm streets of Willmar.

49. And that's what many thought. A crowd of people had formed and were filming the agents. The crowd yelled at the agents to identify themselves and give any legal justification for their actions.

50. Instead of deescalating the situation, the agents escalated it. A blonde female agent, hereinafter "Agent #3", used chemical agents on witnesses without warning or justification. Her image is below:




51. Video taken by bystanders shows at least seven agents running wild on the street. One, hereinafter "Agent #4", a man who wore a backwards white baseball hat and what looks like a small mustache, intimidated witnesses. His image is below:




52. Another agent, hereinafter “Agent #5”, wore some kind of American flag bandana to cover his face as reflected below:



53. A sixth agent, hereinafter “Agent #6, wore a black ski mask, as reflected below:




54. A seventh agent, hereinafter "Agent #7", wore dark sunglasses and had a receding hairline, as reflected below:



55. In total, it seemed that seven agents were involved in the unlawful arrest of Ms. Noor.

56. Media reports indicated that the Trump administration wanted to make a spectacle of the arrests in Minnesota, hoping that Minnesotans would respond in a way that would let President Trump invoke the sedition act.[3] If that were true, these seven agents actively assisted to meet that goal.

57. As the agents manhandled her, Ms. Noor constantly shouted to them that she had her papers. They did not care. Ms. Noor was placed in one of the immigration vehicles.

58. Agent #1 and Agent #3 also got in the car with her and drove her away.

59. The agents left her phone and purse in her car where they could have been stolen by anyone. They also had reason to believe that her identity documents were in her purse.

60. Inside the car, Ms. Noor again told the agents that she had her I-94 card and that she had applied for her greencard.

61. Agent #1 told her, "I don't care."

62. However, he should have. Section 1357(a)(2) requires that for any warrantless arrest made by immigration officials, that the officials make determinations

---

[3] Juliana Kim, Alana Wise, MPR, "Trump threatened to invoke the Insurrection Act (again). What is it?" (January 15, 2026). https://www.npr.org/2026/01/15/nx-s1-5678612/minneapolis-insurrection-act-trump-threats; Steve Karnowski, Hallie Golden, Aamer Madhani, PBS News, "Trump threatens to use Insurrection Act to put down protests in Minneapolis", (January 15, 2026), https://www.pbs.org/newshour/politics/trump-threatens-to-use-insurrection-act-to-put-down-protests-in-minneapolis; Kat Lonsdorf, NPR, "Trump's National Guard deployments aren't random. They were planned years ago." (November 3, 2026) https://www.npr.org/2025/11/03/nx-s1-5593112/national-guard-mass-deportations-trump-2026.

that Ms. Noor was a flight risk and in violation of immigration laws. Ignoring evidence of lawful status and failing to determine flight risk by not asking any questions willfully violates the statute and Congress's intent on how immigrants should be treated.

63. During the drive, Agent #1 talked to someone, believed to be his superiors, either on the phone or on a radio.

64. He told them that he got a "fucking Somali." Ms. Noor was able to hear the response from the supervisor. He said something to the effect of, "Great work, I'm proud of you."

65. During the two-plus hour drive to Whipple, Agent #1 told Ms. Noor that she was going to be punished.

66. She did not know why they would punish her.

67. She was scared and crying.

**B. Defendant continued to punish Ms. Noor while she was imprisoned at Whipple.**

68. Ms. Noor was brought to the Whipple Building.

69. During Operation Metro Surge, the Whipple Building was the headquarters of much of the unlawful activities by the federal government.

70. Conditions at Whipple were horrific.[4]

---

[4] Ben Henry, "New filings shed insight on Whipple Building; Homeland Security stands firm on conditions" KSTP (February 10, 2026) https://kstp.com/kstp-news/top-news/new-insight-inside-whipple-building-dhs-stands-firm-on-conditions-and-treatment/; Richard Reeve "Woodbury man describes conditions inside Whipple Building; Minnesota congresswoman investigating." KSTP (February 4, 2026) https://kstp.com/kstp-news/top-news/woodbury-man-describes-conditions-inside-whipple-building-minnesota-congresswoman-investigating/; Cleo Krejci "The 12 hours of Whipple evidence that made

71. In fact, the conditions immigrants were placed into at the Whipple Building, including limiting access to phone calls, were so horrific that Minnesota Federal Courts had to issue rulings to stop it.[5]

72. When she arrived at Whipple, Defendant and its agents were not confused about her identity or status. Defendant and its agents knew that Ms. Noor was lawfully in the United States. Her detention violated DHS policy, regulations, and statutes. "DHS's own guidance confirms that an unadjusted refugee's failure to adjust status alone is not a basis for detention or removal proceedings, and that detention must comply with 8 U.S.C. § 1226 and be supported by an independent violation of the INA."[6]

73. Further, Defendant and its agents never asked Ms. Noor about her greencard or the application process, basic questions that would be asked if her status was in doubt. Instead, it was Ms. Noor repeatedly asking the agents if they had verified her identity through the week and reminding them that she entered lawfully as a refugee and was adjusting her status.

74. On information and belief, the Defendant and its federal officers who held

---

a judge side with detainees again: non-working phones, treatment like 'animals'" MinnPost (March 30, 2026) https://www.minnpost.com/public-safety/2026/03/the-12-hours-of-whipple-evidence-that-made-a-judge-side-with-detainees-again-non-working-phones-treatment-like-animals/.

[5] *Advocates for Human Rights v. U.S. Dep't of Homeland Sec*. 820 F.Supp.3d 789, 810-811 (D. Minn) (issuing temporary restraining order preventing the transfer of immigrants out of Minnesota within the first 72 hours of detention, requiring detainees the ability to contact their lawyers and family.); *Advocates for Human Rights v. U.S. Dep't of Homeland Sec.*, 825 F.Supp.3d 858 (D. Minn. 2026) (granting preliminary injunction in the case).

[6] *Liban G v Noem*, (SRN/ECW) 2026 WL 125689, *2, (D. Minn, Jan. 16, 2026).

her knew that Ms. Noor was in the United States legally and that she had applied to adjust her status after she had been in the United States for one year as a refugee.

75. When Ms. Noor arrived at the Whipple Building, Agent #1 told other agents in Whipple that Ms. Noor "needs to be punished."

76. At Whipple, she was patted down by male agents despite female agents standing next to her. She felt ashamed. She was mad at herself for not being able to tell men that they couldn't touch her.

77. She also believed that even if she could say it, they would merely laugh at her and make things worse.

78. ICE policy prohibits a male agent from doing a pat-down on a female detainee except in "exigent circumstances" and then it must be documented.[7]

79. Several times over the next few days, men in Whipple would grab Ms. Noor and place their hands on her back, arms, and head. She was powerless to object. Each time she was ashamed.

80. Ms. Noor was quickly separated from other inmates in Whipple. While dozens of individuals were placed in holding cells, Ms. Noor was brought to a "hold room" a small room that, by policy, a detainee may not be held in for more than 12 hours.[8] Ms. Noor was detained in a hold room for five days.

---

[7] See, for example, USICE National Detention Standards, Revised 2025, Standard 2.5 "Hold Rooms in Detention Facilities" II.C. https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

[8] See, for example, USICE National Detention Standards, Revised 2025, Standard 2.5 "Hold Rooms in Detention Facilities" II.A and B. https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

81. The room had no bed; it had a toilet that was slightly blocked off by a small wall that was about three feet high. There was a faucet next to the toilet as well. The door had a peep hole that a guard could look through. The room had no beds or chairs.

82. Ms. Noor had to sit on the floor.

83. She was not given a pillow or blankets.

84. On the first day at the Whipple building, Monday, January 13, 2026, the federal agents placed three male Hispanic detainees in her small room.

85. Placing adult men with adult females violated ICE policy.[9]

86. Upon information and belief, this was done to punish her.

87. There were no beds or cots in the room. All four of the individuals had to sleep on the floor.

88. During the night, the men would have to relieve themselves in the toilet in view of Ms. Noor.

89. There was no reason given for housing Ms. Noor with men in detention and no legal justification. But it was likely a way to punish her because she is Muslim, Somali, and needed to be punished according to her arresting agent, Agent #1.

90. Defendant and its agents must have known their conduct violated establish policy. After all, under ICE policy governing buildings like the Whipple

---

[9] See, for example, USICE National Detention Standards, Revised 2025, Standard 2.5 "Hold Rooms in Detention Facilities" II.B.5. https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

Building, continuous welfare checks required agents to check on inmates every fifteen minutes.[10]

91. The next morning, Tuesday February 13, 2026, a black immigration agent opened the door to her cell and removed her from it. He apologized to her for being housed with men overnight but did not tell her why or how it had happened.

92. He did express confusion on how this happened and yelled at other agents within earshot. A white agent yelled at other men that Ms. Noor had an I-94 and they couldn't house her with the undocumented Hispanic men.

93. He moved her to another hold room within Whipple.

94. He, or another agent, wrote "USCIS" on a piece of paper next to the door, which Ms. Noor believed to mean "United States Citizenship and Immigration Services".

95. Upon information and belief, this designation meant that Defendant and its agents knew that Ms. Noor was lawfully present in the United States and was in the process of adjusting her immigration status.

96. At first, she was alone but about 30 minutes later, a young woman who Ms. Noor believed was from Africa was brought into the room.

97. That woman had a small baby with her and had to breast feed the baby. Again, the room did not have beds, chairs, or privacy areas for the woman to do so

[10] See, for example, USICE National Detention Standards, Revised 2025, Standard 2.5 "Hold Rooms in Detention Facilities" II.D. https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

privately. Instead, she was forced to publicly nurse her baby in front of Ms. Noor and anyone who happened to look through the door's peephole.

98. Housing a breast-feeding mother in this fashion further violated ICE policy.[11]

99. After a few hours, the mother and baby were moved out of Ms. Noor's hold room and Ms. Noor would stay in that hold room alone for the remainder of the week.

100. Ms. Noor was distraught. Her head still hurt from the attack the previous day. Nothing that had happened to her had made sense and now she was trapped with no idea of what was happening.

101. On Tuesday, Ms. Noor got her period. She told a male Hispanic agent that she had her period and it was painful. It was very hard for her to tell him that. She normally would not tell a man about periods at all.

102. The male agent told her that they didn't have anything for her. Upon information and belief, the agent didn't tell anyone about Ms. Noor having a period nor did he look for feminine hygienic products.

103. ICE policy requires that a detainee in a hold room will be provided with feminine hygiene products.[12]

---

[11] See, for example, USICE National Detention Standards, Revised 2025, Standard 2.5 "Hold Rooms in Detention Facilities" II.A and B. https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

[12] See, for example, USICE National Detention Standards, Revised 2025, Standard 2.5 "Hold Rooms in Detention Facilities" II.A and B. https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

104. She was not given any medicine for her period pain.

105. Ms. Noor bled on herself and her clothes. She sat on the floor of the hold room and cried. She was ashamed. She felt confused, angry, and hated. She felt that she had come to America and America was treating her horribly, that she wasn't wanted here.

106. For the rest of the week, Ms. Noor had to wear her period-blood-soaked clothes. The agents did not give her anything for the mess and did not let her shower.

107. On Tuesday, a white agent told her through the door that they had checked her documents, and she was ok and would likely be released soon. He didn't tell her when she would be released.

108. But a few hours later, a male Hispanic agent told her through the door that she was likely to go to Texas.

109. That agent was the agent that usually brought food to Ms. Noor.

110. She asked him what kind of meat was in the sandwich that he had provided but he refused to tell her. Worried that eating that meat would violate her religion, she asked the agent if they would just give her snacks rather than the sandwich. The agent replied that she could have the sandwich or just have water.

111. Failing to provide Ms. Noor with religiously reasonable food violated ICE policy.[13]

112. She ended up very malnourished.

---

[13] See, for example, USICE National Detention Standards, Revised 2025, Standard 4.1 "Food Service" II.F. https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

113. Later, after her release when she went to Urgent Care in Willmar, it was revealed that she had lost around ten pounds while at the Whipple Building.

114. On Tuesday night, the white agent told her that she would stay here and not go to Texas. He told her they would fingerprint her and she would likely go home.

115. Throughout the week, Ms. Noor attempted to talk with the guards. She asked to use a phone to call her family. Each time, she was denied that most basic right until Wednesday.

116. Ms. Noor was very depressed. She felt that because she was Muslim that she wasn't welcome in America. That they were holding her so she wouldn't think she had rights. She was upset that they had hit her. She was constantly crying all through the week.

117. On Wednesday, agents took her fingerprints in the morning.

118. The agents also questioned her about her time in Somali and if she had any connection to the military there. She had no such connection.

119. The agents told her she had to sign a piece of paper. She asked what it was and an agent told her that it would send her back to Africa. He suggested that signing it would get her out of custody faster.

120. Ms. Noor was scared. She knew she wasn't in violation of immigration laws, she had come here legally, and the agents wanted her to throw it all away. She would be separated from her family and sent to a country she hadn't seen since she was a child.

121. She understood that this was a way to sign away her status in America

and she refused to sign it.

122. Upon information and belief, agents pressuring immigrants to sign papers to sign away their rights was a common occurrence at Whipple and elsewhere under the Trump administration. Such actions violated both policy and due process under the Constitution.

123. Upon information and belief, Defendant and its agents unlawfully kept Ms. Noor in detention at Whipple with the hope and expectation that she would sign away her rights and agree to be removed to somewhere in Africa.

124. After she was fingerprinted, she was finally permitted to call her family. When she talked to them, they were very worried. She told them about the food problems. Her family offered to bring her religiously appropriate food, but she told them that they wouldn't be allowed to do that. She was also worried that agents might target her family if they came to Whipple.

125. On Wednesday, Ms. Noor threw up in her hold room. She felt horrible and asked the guards to let her see a doctor. They denied her pleas.

126. At one point, she asked a Hispanic female guard for a doctor. After the woman said no, Ms. Noor told her she felt like she was dying, to which the woman said, "so you die."

127. Refusing to provide her medical care violated ICE policies.[14] It violated basic human decency.

[14] USICE National Detention Standards, Revised 2025, Standard 4.3 "Medical Care". https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

128. Ms. Noor felt horrible—physically, mentally, and emotionally. She felt and was in fact alone with no one to help her.

129. While the actions of the Defendant, the US Government, was indefensible, cowardly, and un-American, Ms. Noor's classmates in Willmar stood up for her. On Thursday, January 15, 2026, 150 students at Willmar high school staged a walk-out over ICE actions in Willmar,[15] as reflected in this photo below:



[15] Levi Jones, "Willmar Senior High students stage walkout in protest of 'unjust' ICE actions," West Central Tribune, (Jan. 15, 2026), https://www.wctrib.com/news/local/willmar-senior-high-students-stage-walkout-in-protest-of-unjust-ice-actions.

130. Ms. Noor, when she learned of this, was very happy and cried.

131. It meant a lot to her that her school and community wanted her in Willmar.

132. On Friday afternoon, January 16, 2026, Ms. Noor was finally released from custody. She did not know why they released her.

133. On Monday, January 12, 2026, while she was still incarcerated, a habeas complaint was filed on her behalf, one of thousands of habeas filed by Minnesota lawyers to fight back against Operation Metro Surge.

134. The habeas was filed by E. Michelle Drake of Berger Montague PC.

135. Her habeas case was case number 26-cv-214 (KMM/SGE) and assigned to District Court Judge Katherine M. Menendez and Magistrate Judge Shannon G. Elkins.

136. In response to the habeas, the government filed its opposition on Thursday, January 15, 2026. It argued that no fact finding was necessary, instead, it argued that U.S.C. § 1159(a) or 1225(b)(2) permitted Ms. Noor's continued detention.

137. Ms. Noor was released before an order could be issued by the court. On information and belief, US attorneys likely came to the conclusion that Ms. Noor's imprisonment in Whipple was illegal. See *Liban G v Noem*, (SRN/ECW) 2026 WL 125689, *2 (D. Minn, Jan. 16, 2026).

138. On Friday, when she was released, an agent put her in a car and drove her to the train station near the Whipple Building and left her there alone. She did not have a phone or any idea where she was.

139. The train station was cold. According to weather reports from that day, the station was likely around 12 degrees Fahrenheit. Ms. Noor asked strangers to use their phones so she could call her family. Fortunately for her, a man let her use his phone, and she was able to arrange to have people from Willmar come and pick her up.

140. When she got back to her apartment in Willmar, she was exhausted. Medical personnel came to the home to check on her. The EMTs were worried about how low her blood sugar was. They told her to go to urgent care the next day but to eat and drink that (Friday) night.

141. The next day she went to urgent care. Her weight had fallen to 109 pounds. The doctors found that her symptoms included "post concussive" symptom relating to her head injury.

142. Ms. Noor has had lingering physical, mental, and emotional consequences from the incident, including anxiety and stomach aches. She also missed a full week of school and work. She is now frightened of law enforcement. Prior to the incident, she smiled and waved to police officers. Now, she recoils in fear whenever she sees someone who resembles an ICE officer. She is still terrified of being falsely imprisoned by ICE. She has nightmares about her time at Whipple.

143. During her captivity, federal officers ignored her wellbeing and failed to provide her with basic necessities, including feminine hygiene products, clean clothes, showers, and food. They callously demeaned and intimidated her by housing her with men. These were intentional acts to punish her and to have her waive her right to live in America.

144. Her captivity itself was unlawful and was intentionally used to punish her and have her waive her right to live in America.

**C. Defendant's actions during Operation Metro Surge were unlawful and conducted with animus toward Somalis.**

145. The action of Defendant agents and officers during Operation Metro Surge was intended to violate the rights of people like Ms. Noor.

146. Prior to January 12, the action of federal immigration agents in Minnesota included extreme acts of violence that shocked the world such as the killing of Renee Good as well as wanton acts of violence on suspected immigrants. Leaders, including Gregory Bovino and Stephen Miller, congratulated and egged on agents to act with more violence and promised them immunity.

147. Defendant gleefully arrested individuals, like Ms. Noor, who had lawful status and should not have been arrested in the first place.[16]

148. Despite nearly 90% of Somalis in Minnesota being US citizens, Defendant targeted Somalis.[17]

149. Examples of animus toward Somalis came from all levels of the executive branch, including the President. On November 21, 2025, President Trump terminated

---

[16] Joe Nelson, Bring Me The News, "Judge: 'Overwhelming majority' of cases brought to him by ICE were for people lawfully in Minnesota" (Feb. 6, 2026), https://bringmethenews.com/minnesota-news/judge-says-most-cases-brought-to-him-by-ice-were-for-people-lawfully-in-minnesota.

[17] Steve Karnowski, PBS News, "5 things to know about the Somali community in Minnesota after Trump's attacks," (Dec. 2, 2026), https://www.pbs.org/newshour/nation/5-things-to-know-about-the-somali-community-in-minnesota-after-trumps-attacks.

Temporary Protected Status for Somalis, claiming, without evidence, that Somali gangs terrorized Minnesota, and, speaking of Somalis "Send them back to where they came from."[18]

150. Upon information and belief, a group of agents in the field will have an assigned supervisor or an agent in charge with responsibility to ensure other agents comply with the law, including the appropriate policies and regulations, and their duties.

151. The agent in charge of the agents described in this Complaint was negligent in allowing the agents to assault, arrest, and then imprison Ms. Noor.

152. Agents in charge at Whipple were negligent in failing to release her and allowing her to be held in violation of policy, regulations, and statutes.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Federal Tort Claims Act – Assault

153. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

154. Under the FTCA, The United States is liable for the tortious acts of its agents/employees/officers.

155. The agents intended to cause fear or apprehension of imminent harm or

[18] Associated Press, MPRnews, "Trump says he doesn't want Somalis in the U.S., urges them to go back to their homeland and fix it," (Dec. 2, 2025), https://www.npr.org/2025/12/02/nx-s1-5629305/trump-says-he-doesnt-want-somalis-in-the-u-s-urges-them-to-go-back-to-their-homeland-and-fix-it.

contact in Ms. Noor when they threatened her while she was in her car, up to and including physically striking her, as well as when they placed her in handcuffs, touched her body, and put her in their vehicle.

156. The agents had the apparent ability to cause the harm as evidenced by the fact that they did in fact do it. And Ms. Noor had a reasonable fear of the contact.

157. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise of performance of discretionary functions or duties.

158. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Ms. Noor to suffer mental and physical injuries.

159. The action of the United States constitutes assault under Minnesota law, for which Defendant is liable for damages.

**Second Claim for Relief**
**Federal Tort Claims Act – Battery**

160. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

161. Under the FTCA, The United States is liable for the tortious acts of its agents/employees/officers.

162. The agents intended to and did offensively contact Ms. Noor when they, among other things, slapped her and physically removed her from her car, as well as by

handcuffing her and forcefully placing her in their vehicle.

163. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise of performance of discretionary functions or duties.

164. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Ms. Noor to suffer mental and physical injuries.

165. The action of the United States constitutes battery under Minnesota law, for which Defendant is liable for damages.

**Third Claim for Relief**
**Federal Tort Claims Act – False Arrest/False Imprisonment**

166. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

167. Under the FTCA, The United States is liable for the tortious acts of its agents/employees/officers.

168. The agents who arrested Ms. Noor violated the legal statutory authority they had to make arrests for immigration violations.

169. The agents/officers/employees of the Defendant violated the legal statutory authority they had to hold Ms. Noor for days at the Whipple building.

170. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or

otherwise, do not constitute the exercise of performance of discretionary functions or duties.

171. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Ms. Noor to suffer mental and physical injuries.

172. The action of the United States constitutes false imprisonment and false arrest under Minnesota law, for which Defendant is liable for damages.

**Fourth Claim for Relief**
**Federal Tort Claims Act – Negligence and Negligent Supervision/Training**

173. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

174. Under the FTCA, The United States is liable for the tortious acts of its agents/employees/officers.

175. Defendant has duty of care for training, supervision, and generally to act according to reasonable standards governing their conduct. The agents/employees/employees of the Defendant had a legal duty of care to Ms. Noor to, among other things, follow the immigration laws faithfully, provide safe and sufficient living conditions to her while in captivity, ensuring her welfare, and to protect her from avoidable injury and harm.

176. By engaging in the unlawful and unprivileged acts described in this Complaint, including but not limited to arresting and holding Ms. Noor without legal authority, failing to follow laws governing the treatment of refugees, failing to provide

her with feminine hygiene products, a bed, a shower, clean clothes, access to a lawyer or her family, failure to provide food that met her religious needs, housing her with men overnight, engaging in threats and physical abuse, and denying her medical care, the federal officers, officials, and employees, at the direction of Defendant, defendant breached its duty and directly and proximately caused Ms. Noor to suffer mental and physical injuries.

177. Further, Defendants were on notice that agents during Operation Metro Surge were in obvious and complete violation of lawful conduct prior to arresting Ms. Noor and failed to correct the actions.

178. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise of performance of discretionary functions or duties.

179. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Ms. Noor to suffer mental and physical injuries.

180. The action of the United States constitutes negligence under Minnesota law, for which Defendant is liable for damages.

**Fifth Claim for Relief**
**Federal Tort Claims Act – Intentional Infliction of Emotional Distress**

181. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

182. Under the FTCA, The United States is liable for the tortious acts of its agents/employees/officers.

183. The actions of the agents/employees/officers of the Defendant were extreme and outrageous such that they are utterly intolerable to a civilized community. Defendant intentionally housed Ms. Noor with three male detainees overnight in a room with only a peephole. Such conduct to those under Defendant's care is unheard of. Separation of inmates by gender is a basic requirement of all detention facilities and a requirement that DHS has for any jail, prison, or detention facility that it contracts with as well as its own policies.

184. The agents/employees/officers of Defendant knew of that requirement but were determined to punish Ms. Noor.

185. Further, by housing Ms. Noor in uninhabitable conditions, including not letting her shower, clean herself after having her period and bleeding on herself or changing her clothes, and intentionally keeping medical personnel away from her while knowing of her injuries and complaints, these same agents/employees/officers engaged in extreme and outrageous conduct that is utterly intolerable to a civilized community.

186. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise of performance of discretionary functions or duties.

187. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant,

directly and proximately caused Ms. Noor to suffer mental and physical injuries.

188. Her distress manifested itself in weight loss, anxiety, and nightmares, and physical pain and suffering.

189. The action of the United States constitutes intentional infliction of emotional distress under Minnesota law, for which Defendant is liable for damages.

## PRAYER FOR RELIEF

**WHERFORE**, Plaintiff respectfully requests judgment as follows:

A. Finding, adjudging, and decreeing the Defendant has engaged in the violations of law alleged herein.

B. Awarding to Plaintiff compensatory damages of $851,000.

C. Awarding to Plaintiff costs and disbursements, including such reasonable attorney fees as are permitted by law.

D. Awarding any and all other additional relief as permitted by law and found by this court to be justified and appropriate.

Dated: November 23, 2026

*/s/ Ian Bratlie*

Ian Bratlie (#0319454)
Bratlie Law Office
931 Madison Ave
Suite 206
Mankato, MN 56001
918-805-0654
ianbratlie@bratlielawoffice.com